Case No. 19-1068 et al. BCP Trading and Investments LLC et al. v. Cmsnr of Internal Revenue, Virginia Simpson Appellants. Mr. Marwell for the Appellants, Galkoven Petite Partnerships. Mr. Clark for the Appellants, Esri LeMay Partnerships. Ms. Rubin for the Appellee, Cmsnr of Internal Revenue. Morning, Counsel. Mr. Marwell, when you're ready, please proceed. Thank you, Your Honor. May it please the Court, Jeremy Marwell for the Galkoven Petite Appellants. I will address the statute of limitations and sham partnership issues, questions about Galkoven and Petite. Mr. Clark will address the Rule 63 issue, questions about Esri and LeMay. And if I'd like to reserve two minutes, if I can. The statute extensions in this case were invalid because they were signed at Ernst & Young's urging and direction at a time when the government at least had reason to know of Ernst & Young's serious and undisclosed conflicts of interest. And that is so for two main reasons. First, the tax court was wrong to conclude that just because taxpayers had noticed that the IRS was questioning the transactions, they also had noticed that Ernst & Young, their trusted advisor, was itself under criminal investigation and faced intense pressure to put its own interest above its clients. Ernst & Young's disclosure letters were at best half-truths and never timely disclosed the existence of a criminal investigation. Second, the result here, in our view, is a straightforward application of Transpac and Blackletter contract and agency principles. Ernst & Young ran the show with these transactions. The record shows that Bolton and the taxpayers relied entirely on Ernst & Young's advice to extend the limitations period, and the IRS knew or at least had reason to know. The IRS knew about the existence of Ernst & Young's conflicts because it was involved in creating those conflicts, and it knew that Ernst & Young was not disclosing those conflicts to its clients, among other things, because Ernst & Young told the IRS that and said we cannot disclose that we're paying a penalty here, otherwise our clients will use it against us in litigation. Can I ask you a question, Mr. Marwold? Because it seems to me that even if you know the fact, I'm not understanding what's gained by denying the extension. And I know that Olson – I know that you rely on Olson's testimony, and Olson says that, well, in some situations, if the IRS has a criminal prosecution in mind, they might forego a civil proceeding. But it just seems to me that that was a conclusion, and I wasn't quite understanding the logic behind it. Why is it that it would be advantageous to deny the extension? So I think the best part of Olson's testimony is 1901 to 1903 of the JA, where he explains this, and he gives a couple of specific reasons. This is the former Assistant Attorney General for the Tax Division of the Department of Justice explaining how these criminal investigations work. And I take there to be several propositions there. One is that the practical effect of denying an extension could be to accelerate the government's work. The government would have to choose between issuing the FPAW, the Final Partnership Administrative Adjustment, or potentially letting the statute lapse. And if that occurs early in the overall swirl of investigations, as the tax court put it, the government might be effectively locked into a particular theory because it's going to have to issue the FPAW. And Olson testified that it's possible that theory would be advantageous to the taxpayer. It's possible that the FPAW would not include findings that would be necessary to support a later claim of fraud. And there's also the possibility that there's a desire to keep the criminal investigation confidential, and that might be unknown enough. Or some of the concerns that have occurred where you have the target of a civil investigation providing documents or perhaps interacting, providing information to the government without knowing that there's a criminal investigation. So pending, you might have amendment concerns. So there's the need for very careful coordination within the government, and that, I think, is the key problem. That is what the taxpayers here didn't know about. So on that issue, within the government, you mean between the criminal and civil parts of IRS? Yes, and I think there's also coordination. Here we had the criminal side, I think, kicked off when the Southern District of New York called Ernst & Young's General Counsel and said, Hey, we saw this newspaper article. Please preserve documents. We're considering convening a grand jury. And we have evidence in the record that there was coordination happening, both between the civil promoter audit team and the criminal investigative division within the IRS. And you had both Ernst & Young and, as I understand, the IRS aware of the existence of the Southern Districts. What do we do, as between civil and criminal, what do we do with the stipulation that civil didn't know? So the stipulation, as I read it, talks about the team that was doing the audits, the CDS audits, like of the partnership here. I think the facts are different as to the promoter audit team. So the team within IRS, the civil promoter audit team that was investigating Ernst & Young, and that team, the record shows, had full awareness of the criminal side. In fact, they met with the criminal investigative division in 2003. And you have the Phillips case from the Ninth Circuit, which says we're not going to look just at what individual employees within an agency. We're going to attribute that knowledge to the commissioner as a whole. So I think, unless you want to take a different approach than the Ninth did on that, it's a little, slices it too fine to kind of divide division by division. And I mean, the degree of knowledge is something that the tax court did not really provide findings on. As I read the opinion, they more or less agreed with us that Ernst & Young had a conflict, and they agreed that, didn't dispute that the IRS had awareness of the conflict. The tax court's ground of decision was focused on the notion that the taxpayers here either should have known or had reason to know. And so if you are concerned about issues like the IRS knowledge, I think that wouldn't be a terrible reason to remand and allow the tax court to make some findings in the first instance and that you could then potentially review later. But as to the knowledge of the taxpayers, this is somewhere where the tax court just had significant errors that I think, even understanding the difficult burden of a clear error standard review, there are problems here. So for instance, the tax court said that in July 2004, Ernst & Young wrote to my clients, the Kalkoven Pettit, to say, to disclose the existence of the grand jury investigation. That's just contrary to the stipulation. The stipulation is there is no evidence in the record that those letters were ever sent to our clients. And so when you look at the only other evidence in the record, the earlier disclosures, they're really cramped. And if you look at this through the lens of a fiduciary, it's hard to understand what Ernst & Young was doing. You know, this sort of half-truths, well, there was a promoter audit, but they don't mention the fact that they paid a penalty. In 2004, when Pettit called Ernst & Young and said, what is this about the grand jury? The testimony undisputed at JA1419 was that Ernst & Young's contact partner said, oh, don't worry about that. That has something to do with some individual partners. It doesn't have anything to do with you. And so if you, under the, we viewed TransPAC as kind of an application of the more generally applicable agency and fiduciary principles. And it's, in our view, artificial to distinguish between Bolton, who signed the partnership extension here, and Ernst & Young on these particular facts. I mean, the government raises concerns of what are the, what is the practical consequence of our position for their conduct of investigations? I think the answer is on these facts, where you have Ernst & Young at the center of the storm and the government went after them first for creating and marketing these transactions. And you had Ernst & Young listed as the power of attorney for the individual taxpayers. And you have evidence in the record that the IRS said, OK, we know we want to get these extensions. Ernst & Young is going to help us out, especially if the partnerships are uncooperative. I don't view it as a material extension of TransPAC. And our bottom line on what the practical consequence for the government would be is what they should have done here was asked. And that's what their own regulations say. If you have reason to know that somebody representing the taxpayer before the commission has a conflict, you need to ask, did you disclose and did you get a waiver? That's what Circular 230, which is in the CFR, it's their regulation, says. And it's what didn't happen here. I know that this is this is not something that would feed back necessarily into the legal conclusion that you're urging upon us. But as just as a matter of what happened once, even after everybody knew what was going on, there was still an agreement for their extensions. Yes. Two response to that. First, we have a somewhat unusual statute extension language here that says if you're going to extend, you have to do it before the expiration of the period. I think that's an A5, A6 of our blue brief. And so once the statute is expired, I don't think the subsequent extensions are legally relevant just to that analysis. But I take the broader point to be, is there something unfair about allowing the proposition that we are advancing? And I guess I would say two things. I mean, one, the calculus about what a taxpayer might do changed over time. We started with the discussion of Olson and the reasons at this early point, it might have been the right point to sort of make the choice. Once you've chosen a fork, you know, the IRS investigation or the criminal investigation is further along and the calculus might be different. And second, I mean, the undisputed testimony from Kalkova and Pettit is that they didn't know until much later and that they didn't ask, at least at the key time, for the extensions that were challenging. They weren't asking, you know, their outside counsel. In some instances, the outside counsel didn't exist yet. And then the later extension, that just wasn't something they were asking their outside counsel about. My time has expired. Judge Walker? If I could ask one question on the extension and then maybe a question or two about the second issue of whether this was a tax shelter or not. On the extension, can you give me a, this is similar to a question I asked in the last argument, can you give me a case where it wasn't the tax partner who had a conflict, but it was an advisor to the partnership that had a conflict with regard to either the tax partner or the other partner signing an extension and the court ruled that the extension was invalid? Right, so I may have to patch that together. The case that exists applying the propositions to statute extensions is the 22 strategic case. It comes out the other way, admittedly, but the claim there was that the I don't read the case as disputing that the general Transpac proposition would apply there. But in terms of doctrine to get us all the way home, that's why we think you should read Transpac in light of these agency and fiduciary principles. We cited the restatement in part as a collection of actual law, but that's where you get essentially the third leg of the triangle. You've got the advisor and there, if you have, I don't take it to be disputed that if you have an agreement, and that's the word in the statute here, the agreement, that's what we're doing with these extensions, where a party knows or has reason to know that somebody is entering into that agreement because of a breach of fiduciary duty by an advisor, that that is grounds to avoid the contract. So I have to put those two things together. So admittedly, it's not a case from this court, but I think that's what we have. I appreciate that. And then to shift to how the partnership and to the extent it – I know you don't say it was a tax shelter, but I want to try to figure out how it worked. I think I have a sense of how it worked, at least as much a sense as someone who has never run a tax shelter before might be able to figure this out. But I don't know. Am I supposed to ask you this or Mr. Clark? I'm happy to answer the question. I'll try. Okay, so here's how I understand it, and if I wanted to put something like this in a fact section of an opinion, I want to see if you think it's right or not. One of these limited partnerships claimed a basis in BCP that was equal to, let's say, $700 million. That number, according to the IRS, was high because it took into account the long option while disregarding the corresponding short option. I know you would say it's not artificially high, but let's put that question aside. This limited partnership that has claimed a basis of $700 million has a capital account with BCP that is reflected with a $3 million figure. So basis of $700 million but a capital account of $3 million, and that's because that $3 million is what the limited partnership paid for the options when the premiums were netted together. They took the long option premium. They subtracted the short option premiums they received, and it comes to $3 million. Then time passes, and the limited partnership withdraws from BCP, and it receives about half a million dollars worth of yen. And so it claims $700 million minus half a million dollars in losses. Now, putting aside whether that's legal, perfectly legal, or a little sketchy, or completely illegal, that's not my question. My question is, do I basically have a sense of what happened? I think that's right. I don't know that those are the exact numbers from the record. I think they're going to be hypothetical numbers, but that is the basic framework. If I could pivot to the one-sentence legal point, which is that as I read ASA and VOCA, this court's decisions, the question is, is there a legitimate non-tax business purpose? And the thing that makes this case different from all the other cases that the Commissioner cites is that we had undisputed expert testimony about the diversification benefit from this setup. And that's the part Your Honor's hypothetical didn't talk about, was what is it that was being contributed? And I think that's the hard thing if you're going to write an opinion against us. What is it that you say? Because for whatever reason on the facts of this case, the government did not engage with the expert testimony that you in fact had diversification benefit by pooling options from one partner that were in some currencies with options with other partners. And by doing that, you did what diversification usually does, which is reduce variability. So it's a little like putting some money in a bank account and not leaving it all in the stock of the company you just left. So since you opened that door, let me ask. Here's my thinking on diversification here, and you tell me why you think I'm wrong. Diversification is obviously a business purpose if you are taking money in the bank and deciding how to invest it in a way that will make more money. So maybe I'll invest it in bonds, and that will make some money. Maybe I'll invest it in stocks. That will make some money. Maybe I'll invest it in real estate. But you could always just keep it in the bank and neither make nor lose money. And your argument seems to be that this was diversification because they took some of the money that they could have kept in the bank, and they put it in a place where they were guaranteed to lose money. And I don't see how that is consistent with diversification as a business purpose. So I think my fundamental response to that is that diversification needs to be thought of distinct from profit motive. And I think the point Your Honor just made conflates the two. I mean, one way to think about it is preservation of capital is another business purpose. And the facts we had here were these were executives who were coming out of companies. Almost all of their net wealth was in the stock of that company. So they needed to diversify. And so it's not a question of having their funds in a bank and leaving them there. It's a question of what is the portfolio they can put together that in aggregate will avoid, perhaps will make money, but what will avoid potentially lost capital. And so, you know, I take the point that there may have been other investments and that these may not be the investments that, you know, Your Honor might make. But these were essentially bullish bets on currency. And the experts did agree that the taxpayers had essentially a 30 percent chance of doubling their money if the options expired in the money. And so it was a losing investment. But the question is, does that cross over the business? Does that have no business purpose? And that I think to return to what is hard for the for the court. If you're going to rule against us is what do you say In the portion of the opinion where you say we know we have undisputed expert testimony that there was in fact a diversification benefit achieved. And you have the language of BOCA and ASA, which says it's the absence of a non tax business purposes that it's fatal. So we're not talking about, you know, a facade. We're talking about a case where you have Evidence of a substantial business purpose and you need to balance the language BOCA and ASA against the other proposition, which is the taxpayers are allowed to organize their affairs. In light of tax benefits and sometimes to take advantage of tax benefits. So You said that there's evidence there was a 30 percent chance of doubling their investment. I thought that there was something that was either undisputed or was a factual finding by the tax court that there was no way that the Amount of money, the your clients could have made There was no way that that amount would be bigger than the amount of the fees that came along with the transaction. Yeah, and I'm sorry, I should correct 30% is if you have a particular option pair. What are the chances that it is that you that expires in the money, not the lottery payment, but just if the currency moves and then you would double The net premium paid was 16.5 for all the pairs and you would then have 34 but you're correct that you if you're thinking about it from a profit potential You have to also take into account the fees paid, which, as I understand it, we're 40 million on top of the 16.5 premium that you paid So if, if, if I run that math and you take into account, you know, the 30% chance of doubling your money. It is a losing proposition, as your honor stated, but the question is, you're still preserving some capital. I think it gets to something like, you know, you have a chance of preserving 60% of your capital. So again, that may not be What the optimal investment would have been. It may not be And this is a friendly. This is a friendly question, but I take it that when you're dealing with this much amount of money. You can't just safely put it in one bank account and leave it there and say, well, I know it won't make money or lose money because I guess there's a risk what the bank would Would go under and there's not that much amount of money is not insured by FDIC or I mean I'm way over my head here, but am I. Is that kind of your point. No, that was. Yeah, I agree. And that's part of part of the three. That's why I said we The facts here. You have four corporate executives whose money was complete net wealth was completely concentrated in the stock of the company. They had just finished running. They couldn't trade, you know, while they were still there. And, you know, that that is very different than a bank account, you know, if If your company gets into trouble at, you know, as can occur, then your net wealth may go down. And I don't think the FDIC ensures at the level of assets. We're talking here so But there's other places you could get in terms of diversification. There's other places you could go that would allow for that kind of diversification without baking in a profit loss. That's correct. And so, but I think the question is not, was this the optimal investment that you know or even or even the even the question is not, was this, you know, a rational investment is, is there a legitimate non tax business purpose and Again, the thing about the record of this case that I don't think the tax court engaged with was the expert testimony on rebutted that there was in fact an objective diversification benefit because of the pooling and that's a fact that's not present as I read in any of the other cases. Okay, thank you, Mr. Marwell, unless my colleagues have further questions. We'll hear from Mr. Clark and we'll give you your rebuttal time you requested. Mr. Clark. Good morning, and may it please the court, George Clark, on behalf of the Esri and LeMay appellate entities as Mr. Marwell indicated, I'm going to address Rule 63 but obviously also here to field any specific questions you have about Esri and LeMay. Rule 63 requires two things, basic things. One, that the judge be sufficiently familiar with the record and two, that the judge determined that the case can be completed without prejudice. On that second point, the rule actually puts an affirmative duty on the judge to make that determination. And as the Advisory Committee specifically cautioned courts risk error to determine the credibility of a witness that's never been seen or heard. And that's natural. That makes sense, right. I mean the Supreme Court's instructed the courts always have to be sensitive to the problems of making credibility determinations. We understand that, right, you need to be able to see these witnesses speak. Echoing the Advisory Committee, you know, this court in Thompson explained that a retrial could be warranted even with the party's consent if the credibility of witnesses is in question. So let's talk about these credibility determinations, right, that Judge Holmes made. As Mr. Marwell and you have been discussing, you know, a key question in the case is whether E&Y misled the taxpayers regarding its criminal investigation when the statute extensions were signed by Charles Bolton. That's kind of core to the case on the timeliness point. Now for their part, the taxpayers testified that E&Y never told them about the investigation and certainly never told them that E&Y had a desire to cooperate or intended to cooperate, right, with the government. But without hearing from the taxpayers, Judge Holmes, and the sites I'm going to give you are from the Joint Appendix of 2408, which is the opinion at 44, Judge Holmes found that he could not believe that E&Y hid its intent from the taxpayers as they claim. He also found that as to Mr. Estrin and Mr. LeMay, that they understood, quote, far more than they let on, and that this, quote, undercut their claim that they had blindly relied on E&Y. Again, this is all without ever hearing them speak. Finding witnesses lacking credibility on such critical points without even seeing them speak isn't even due process, much less consistent with Rule 63. Now, in fairness, Judge Holmes pointed to King and Spaulding. That was an outside counsel. Mr. Marwell referred to some of these people as outside counsel. So he referred to King and Spaulding's involvement as a contemporaneous advisor as one of the reasons why he didn't believe that they relied solely on E&Y. But both Mr. Estrin and Mr. LeMay testified in detail as to why King and Spaulding was hired, what their relationship was, how they talked to King and Spaulding, what they relied on King and Spaulding for, what they didn't. And remember this, King and Spaulding didn't know about this criminal investigation, right? They couldn't have. E&Y didn't tell them, and E&Y didn't tell the clients. Similarly, Judge Holmes relies on this mid-2003 call from the New York Times to Mr. LeMay. He says that's something that should have gotten Mr. LeMay, as a sophisticated businessman, should have got his antenna up. But nowhere in the opinion does it address that in the witness stand, Mr. LeMay specifically talked about what he did after he got that call, that he picked up the phone and called Bob Copeland at E&Y and said, Bob, what is going on with this? And Bob Copeland told him, look, this has nothing to do with you. It has nothing to do with this case. It has to do with these E&Y recordkeeping and filing compliance issues. Mr. Clark, let me give you a chance to correct where I am on this. I understand your argument to be that very sophisticated businessmen, your clients, had read in the newspaper, had been told by a newspaper reporter, and had been told by King and Spaulding that Ernst & Young might be up to no good. And the reason, according to you, why it was justifiable for them to continue to rely on Ernst & Young is because they called Ernst & Young and said, is everything on the up and up? And Ernst & Young said yes. I don't know that that would be justifiable reliance with the most unsophisticated party, but we're talking about corporate tycoons here. Tell me why I shouldn't go down that road. First, Your Honor, I would say that the sophistication of the executives notwithstanding, they had been in relationships with E&Y since the 80s. They trusted E&Y with everything in their financial lives, so there's an evolution. I'm sorry, Mr. Clark. Hadn't they already been asked to resign by Sprint because they had previously taken the advice of Ernst & Young? It depends on which points in time you're talking about, Your Honor. You'd have to look at the timeline. There are points in time when some of this happened that was after that point. The first time they signed the extension was December 4, 2003. That was as of May. So let's take that. By December 4, 2003, hadn't they already been asked – maybe I'm wrong on my timeline. Had they been asked to resign by Sprint by December 4, 2003 because they had followed – in part because they had made some decisions based on bad advice from Ernst & Young? Your Honor, I believe that is correct. I believe that is correct. Your argument is that it was still justifiable for them, even having lost their jobs, to continue to rely on the people whose advice had cost them their jobs? Your Honor, what I'm saying is E&Y was telling them that there was nothing to worry about, that they were okay, and that this would work out okay. And what matters in our context is no one that has decided this opinion has sat and listened to them and seen their faces and had them explain this, not me, about what they were thinking. You consented to that, and they consented to that, right? Your Honor. Go ahead. Sorry. We consented to a decision without recall of witnesses. We didn't agree to a decision that made factual findings that were contradicted by unrebutted testimony. When I say unrebutted – well, Your Honor, when I say unrebutted, we're not talking about a… Let's just say I consented to arbitration, but I didn't like how the arbitrator found facts. No, I don't think it – Speaking of that, I mean this is also on my mind, so I'll give you a chance to tell me why it shouldn't be. Sprint, for example, while your clients were running it, had contracts of adhesion all the time. And I'm sure Sprint was arguing in court every day of the week that, for example, the arbitration clauses in those contracts of adhesion should be enforced. And I'm sure that their opposing parties were saying we didn't really know what we were getting into, and your clients would say no. A deal is a deal. A contract is a contract. An agreement is an agreement. And for them to then come here and say yes, we signed the extensions, and we made an agreement, but we were misled by a third-party advisor. Your Honor, this isn't a little thing. This is a big thing. Your third-party advisor under criminal investigation after Arthur Anderson has actually imploded because of a criminal investigation, E&Y, it was all hands on deck to try to save that entity. I mean they hired William Z. Connolly, the most sophisticated criminal tax counsel in D.C. They were seriously concerned about this, but let me go back to the point about this unrebutted point. We're not talking about a situation where we have one witness that my witness said the light was green, and the other witness said the light was red. In that, you can blame us for not asking for a retrial. No witnesses testified to the contrary in all these statements that I was talking about. No witnesses testified to the contrary. There's no contrary documents. When IRS counsel cross-examined these men, they drew the same testimony. It's all one way. And as Judge Holmes was putting his opinion together, if he's thinking to himself, I don't believe these people. I just don't believe them. He needs to ask for a recall himself so that he can see what they say. I thought they were credible. I can't vouch for my own clients. I can't vouch for witnesses. But somebody needs to hear them say this as a matter of due process and under Rule 63. My only last thing, Mr. Clark, is with regard to Williams and Connolly, I'd always heard everyone say that Baker and McKenzie were the best tax lawyers in D.C. I'll take your word for it on Williams and Connolly. Thank you, Your Honor. Unless my colleagues have anything further for you, Mr. Clark, we'll hear from the government. Thank you. Mr. Rubin? Good morning. May it please the Court. My name is Jennifer Rubin, and I represent the commissioner in this case. This case arises from a marketed tax shelter in which taxpayers used short-term, self-contained, guaranteed money-losing transactions to generate artificial tax losses far in excess of the money that they paid to participate in it. The tax court properly upheld timeliness and the substance of the commissioner's administrative assessments. I'd like to start with timeliness. And, you know, as I was reading through the reply brief, it really struck me that the taxpayers here are seeking to expand the TransPAC line of cases in four critical ways. I'd like to go through each of the four and then go back through them in more detail. Number one, they're seeking to expand to advisers and not just to the signatories on the extension concepts. Number two, they're seeking to broaden conflict to include any time that a third party has an incentive to favor their own interest without requiring any IRS knowledge that these taxpayers in particular likely have different views on extending the time. Number three, they're trying to rely on institutional knowledge without any showing that the people who obtained the extensions, the people in exams, had any reason to know of any alleged conflict. And number four, they've tried to expand the understanding of what is a criminal investigation. Let's go through each of those back in order. Back to number one. Can you repeat number two? Sorry. Absolutely. I just wanted to make sure I get that before you go back to number one. Sure. And if you'd like, I could start by talking with that one. It's broadening the concept of conflict of interest to include any time a third party has an incentive to favor their own interests and not requiring IRS knowledge that the taxpayers likely have a contrary view on extending the time. And I'm going to hook here directly to the Henry Martinez case out of the Fifth Circuit. At 564 F. 3rd at 729, it says it requires a showing that the tax matters partner had caused to prefer his own interest and that the IRS knows that the, quote, actions are more than likely contrary to the wishes and interests of the limited partners. All three invalidating cases here actually include those specific facts, both that the IRS knew that there were incentives to favor their own interests and that the tax matters partners interest actually conflicted with the actual or likely interest of the partners. Transpac, the IRS knew that the tax matters partner were aware that they were targets of an active criminal investigation and they knew that the limited partners had refused to sign extensions. Leather stocking. The IRS knew that the tax matter partner had a secret plea agreement with the government promising to help resolve the tax claims of the taxpayers. And also knew that the tax matters partner was defrauding the limited partners who therefore had an interest in expediting the investigation in order to Establish to learn about the fraud and to stop the fraud. Number three, River City ranches. The IRS knew that the tax matters partner was defrauding the limited partners and knew that It that the IRS had already lost the first case in that particular tax shelter and needed additional time to investigate the tax shelters, which was how they uncovered the fraud. Such as the limited partners had specific reasons to expedite litigating their case, you know, and what's really interesting is, you know, the taxpayers in their reply brief. Go into, oh, here's this tax court remand from River City branches, where they they threw out this extension. But what's really interesting there. Is it didn't throw out all the extensions in the case, they only throughout the extensions after the IRS learned of this contrary interest after they learned about the fraud. So can I ask you, is your broader point here. I get that there's some detail factual points about these cases that may or may not be salient distinctions, but is your broader point here that Look, there's only so much that the IRS can be expected to investigate and look into Before it relies on these extensions, because it needs to be able to rely on extensions, because that sets the kind of administrative architecture so that the IRS can go on and do its work. And you'd have to dig really, really deeply to figure out what was underlying some of this, whereas in some of the cases that you were just talking about it was obvious the IRS already knew Is that, is that the point or is it that actually the incentive underlying incentive structures were different. In those cases, as opposed to this one, and that in those cases, there was actually a reason to want to deny the extensions, whereas here. There's not a reason to want to deny The extensions, because as to the latter one, there is there is testimony in the record that there was a reason that the taxpayers might want to deny the extensions. There was a tactical reason that they might want to deny the extensions. I'd say it's both points. Obviously, as we argue in our brief, we need to be able to rely on extensions and but I would say that The fact that there's specific knowledge of reasons specific to these taxpayers in Transpac, leather stocking, River City, ranches, why they in particular might not want to extend Is actually quite relevant because they don't have anything of that here. They have somebody who comes back after the fact, as an expert. I don't think actually admitted to talk about this point, but in all events comes in and says, well, theoretically, hypothetically, it might have been to their benefit to not extend, maybe But there's no indication that the IRS was aware that they were more than likely would not have wanted to extend. In fact, the IRS was aware of one very big reason why they would want to extend And that is the potential to participate in a global settlement initiative, which in fact for the CDS shelters, the IRS did provide a global settlement Offer in 2006 which only taxpayers who had extended their time we're going to be eligible to try to get a hold of And notably, you know, most taxpayers did in fact seems like they settled their cases for CDS, you know, very few actually tried to litigate their CDS shelters and so From the IRS's perspective, and there's absolutely nothing contrary to this to show that the IRS had specific knowledge that these taxpayers had more interest in expediting than in extending You know, they're, they would look at it and say, I think they have an interest in continuing to go forward. And have the period be extended so that they could potentially be offered of the global settlement. And so I would say it's it's really both of the points that she made. Because clearly, especially when you consider going back to my first point that they're trying to extend trans back beyond just The taxpayers partner who actually signed the extension to the advisor. It really does mean that we would have to do an investigation of each and every extension, particularly in partnership cases. Can I ask you this question, though, just at a high level generality. So, so if you have a situation in which let's suppose there's no gap between Bolton and E&Y, let's just take that Out of the field division. I know you don't want to do that. And, and I think that might have been your first of four points. I can't remember, but let's just let's just suppose that we just collapse it and we only have one That's an issue. So we remove will remove that gap and then we we also say that The IRS knows that that joint entity has a conflict of interest. But the IRS doesn't know that the taxpayers would have a reason to deny an extension That right. But are you saying that even in that situation. The we should take the extensions at face value. Yes, because you need to further to really be a conflict of interest under these cases. And again, I'm going to point you to Martinez. You need to show both that the, the, the person who signed. Let's just say, hypothetically, that Bolton was the one that there was an investigation of. So we'll just ignore it for the moment. You'd have to know that Bolton had an incentive to favor his own interest, but you also need to know that his interest actually conflicted. More than likely conflicted with the interests of the taxpayers, you know, otherwise, you know, if you have an interest to favor your own interest, but they happen to align with the taxpayers. No harm, no foul. And that's what the case law says. And there's been absolutely no cases that have thrown out any extension consents where there hasn't been a showing that the IRS Was aware of specific facts establishing that the taxpayers either objected to extending the time as in Transpact or likely would have Objected as in leather stocking and River City ranches. There's simply no case that supports that. And for good reason. You need to be able, the tax system relies on extensions. Extensions are Very frequently given out. It's a kind of standard, you know, I believe both Phillips and Madison recycling at the point, this is This is kind of plain vanilla. This is something that happens all the time. And so for the IRS to look behind it. They really need to have some reason to think that these taxpayers had reason not to sign and not just some hypothetical that someone came up with Years after the case, but actually had facts at the time saying these taxpayers had reason not to extend and therefore I have reason to distrust the extension that I'm going to rely on You know, there's several hundred million dollars of taxes that issue here, the IRS relied on these extensions. It's not enough that there's just a conflict. I mean, when we talk about a conflict of interest. We're assuming that there's a conflict of interest as between and you're the way you read helpfully refashion the hypo Bolton. And the taxpayers were assuming that there's a conflict of interest. But what you're saying is Even the existence of a conflict of interest as between those two doesn't matter unless we the IRS has reason to think that as to the particular issue of granting an extension, there'll be a reason that Bolton would want to acquiesce in an extension, but the taxpayers might not Exactly, exactly. And you don't, you don't need this. I think you need to win that in order to get an affirmance here. I understand that that may be your theory. No, I absolutely. I think they lose if they will lose on any one of these points. Yeah, you know, this is a tremendous expansion. They're looking for and every single one of these points, I think, is very problematic, but we don't have to win all for Absolutely not. They're all independent, you know, let's turn to number three, you know, they're relying on an institutional knowledge of a conflict. And they're not requiring any showing that the employees in examinations knew the alleged conflict and Again, in each of the cases as best as I can read them Transpac leather stocking River City ranches. The people handling the exams, the ones who actually obtained and relied upon the administrative adjustments, they actually had knowledge of the facts that were relevant, which is not true here. Now, it is true as my as my opposing counsel made noted, there's some language and Phillips regarding attributing knowledge of examinations and the criminal investigation division to the commissioner, but there's There's nothing saying that you should go in reverse. And the fourth and final thing is that they've really expanded And understanding of what it is for there to be an active criminal investigation for anybody to be aware of, you know, as my Opposing counsel described it, you know, you have this phone call that comes from somebody at the Southern District of New York, who says, Hey, I saw an article. I think you should be You should be preserving documents and let me know if there's anything illegal has gone on the following month in July 2002 The chief counsel of the IRS talks to counsel for Ernst & Young and says, you know, we have not made any criminal referral for Ernst & Young Also that same person from the Southern District of New York also talks to Ernst & Young's counsel and says, yeah, they have not made any criminal referral at this time, which they they hint a lot on that at this time language. But, you know, I'm still concerned. And based on that, they say, well, there's your, there you go. There's your incentive to go against Our interest, which again, you know, showing that is against their interest, but it also is a very problematic, but they have expanded it To this extent that if somebody somewhere in the Department of Justice makes a phone call that there you go. Suddenly, we should be assuming that Ernst & Young is acting outside the interest of the taxpayers. And again, I know for hypothetical sake, we assumed that Bolton had a conflict. But again, there's absolutely no evidence of that in the record. And certainly no evidence that the IRS would have been aware that he had any conflict. And that, in fact, if you focus solely on the tax matters partner, which we believe you should under the case law. They lose. And one final point. They did make a point, my opposing counsel made a point regarding timeliness saying, well, you know, you have to have the The extension has to be done before the time has run out. And so you should ignore all the subsequent ones. We don't think that's true because I think it does go To whether in fact they actually had any conflict of interest here, but in all events that really raises the point that since they've conceded everything all the extensions that were done after September 2004 They basically conceded timeliness for tax year 2001 because all the extensions that happened for tax year 2001 were in later time frames after Ernst & Young was no longer involved. So really timeliness only goes to tax year 2000. If I could briefly turn to the sham partnership thing. I just wanted to reiterate that to the extent that there was any diversification benefit. It was solely within the context of this short term self contained money losing tax shelter. And it only really operated in tandem with doing two things that were critical to operation of the tax shelter. Number one, consolidating in one partnerships, you get that basis increase. And number two, ensuring that you've got some distribution of yen. It basically kind of reduce the chances that any one of these partnerships would have $0 distributed to them from the partnership. Are there any further questions on sham partnership or on On sham partnership, Ms. Rubin. What's the difference between a An illegal tax arrangement and the things that people do all the time where they, you know, instead of putting your money instead of putting money that you want your kids to inherit In something, in a bank account, you put it in a trust or you want, you know, you want my understanding is that people make decisions all the time that have no purpose other than To avoid paying taxes and that those are those are legal. And then I also am completely on board with with the case law from our circuit and elsewhere that there is a line that someone can cross and it becomes illegal. How is this different than A parent putting money in a trust. So the kid inherits money that's, you know, more tax free than it would otherwise be Well, the trust situation is one where somebody is actually taking a material step to remove themselves from having control of that money and put it into some other entity and there's there's Lots of trust are very pretty complex, but Maybe just like You know, they put their money in a 401k instead of a regular stock market account and they do it because it has tax benefits. Right. That's because that's what the law intended and what the economic sham doctrine basically is really all about is saying, you know, Congress can't think of every single thing. And so we're going to look behind this transaction and say, was there a legitimate business purpose or was this simply for tax avoidance and not for what Congress intended Congress say, for instance, with your 401k example Congress decided to give an incentive to people to put money aside for their retirement and said, okay, we're going to let you do this up to this certain amount and you're going to get some tax benefits from that because we want you to do that and Let's, let's say I'm, let's imagine that I'm a tax lawyer and a client comes in and says, you know, I have $100 million and I want to pay as little taxes as possible. That's my only goal. Give me your advice. Am I, am I allowed to answer that question. Yes, you're allowed to answer that question, but you're not allowed to pick a tax shelter that is basically just economic waste done in order to create artificial tax losses. That's a lot of the problem here is that there were artificial tax losses, you know, That's my question is, is, what's the difference between artificial tax losses and tax losses. Okay, so, um, for example, they paid $16.5 million net to purchase these option pairs, but they claimed $3.1 billion of losses from them. And you know that since they didn't economically experience those losses, they weren't really the types of losses that Congress intended you to deduct. That's an artificial tax loss. It's money that you claim you lost, you didn't lose. You know, and here what you have is These taxpayers. You know, Kirk, Cal COVID and Pettit Saw that they're going to have a whole lot of money coming in. So they engaged in a whole bunch of tax shelters they engaged in Cobra shelter they engaged in CTS and then they engaged in add on and Add on in particular, it created these absolutely artificial tax losses and had zero chance of being profitable, which is at this point, really, it's uncontested. That being the case, you know, you look at me say this. Is this really what Congress intended was for someone to engage in something that has zero chance of profiting. In order to claim losses. They didn't experience on their tax returns and and that's really where, you know, ace investor rings and the culverts and line of cases that Asa actually relied upon And book investor rings, which cited both Asa and Culbertson. And in tech side both Asa and Culbertson. That's what these cases are really saying is that when you really have this transaction that's actually just a wasteful Way of claiming false artificial tax losses without any real business benefit. And, you know, I we stand by our on our brief as to why in fact their diversification argument really was just a facade, because again, it was just within the context of this tax shelter that was designed to create artificial tax losses. Can I can I ask one last one last unless my colleagues have further questions. One last question, which I think is in the same vein as Judge Walker's question. There's some sense that this tax I'm not trying to use scheme pejoratively, but I just, I can't think of off the top of my head of another word for this, but the tax enterprise that issue here is a SEC is a cousin of son of boss. Yes. And can you just describe at whatever level of generality, you choose And as efficiently as possible. What, why this is a cousin of son of boss, since we already know that son of boss is tax mechanism that is fits in the category of unlawful ones. So, so basically you have this transfer to a central partnership of a pair of Assets, one of which was in theory worth a lot of money and the other one, which was absolutely attached, but had it had a contingent liability. And then by putting in the partnership, they claim the basis for the high value item and ignored the contingent liability, even though when they actually bought these two items. They paid a net premium that was substantially lower than when they inevitably lost money. They came back and said, Oh my gosh. I lost all of this basis that I had in this great in this partnership and BCP And it really all comes down to that same stream. I believe the tax court has a nice little paragraph that we quoted in full in our briefs that just kind of goes through why This is a cousin, but that that's really what it comes down to is the pairing of the asset and the contingent liability while ignoring the contingent liability for purposes of your of your basis claim. Okay. Thank you, Mr. Rubin. Mr. Marwell will give you, I believe you requested two minutes. We'll give you two minutes of rebuttal. Thank you, Your Honor. If I can talk first about whether we are asking for material expansion of Transpac One observation, a decent portion of The commissioners argument relied on issues that the tax court did not make findings on such as the IRS is knowledge or lack of knowledge and that puts this court in an awkward position. If the court concludes that those are the key issues, then a remand may well be appropriate. Two reasons why we're not asking for a substantial extension. First, The basic conflict here that that the extension was being granted at the urging or direction of somebody who was under criminal investigation is the same as in Transpac And the Second Circuit found it essentially self evident that somebody signing that it would be a divergence between the interest of the person who's under investigation and the limited partners. As to the question of whether the IRS had specific reason to know that the signatories here might have had a different interest than The taxpayers. Transpac cited the Internal Revenue Manual for this proposition, the IRS would, I think, would at least be on notice of that and that fundamental conflict. On the institutional knowledge and the question of which agency employees. I take the Commissioner to be asking this court to do something different than the Ninth Circuit and you do have Even if you disagree with the Ninth Circuit, things like the IRS is non docketed service advice quoted in our brief that says, you know, even the target of a civil promoter audit can have a conflict for largely the same reasons as the criminal As the target of a criminal investigation and as to whether there was an active criminal investigation or not. I mean, the key is Whether the Ernst & Young and the signatory was under intense pressure because of the existence of a criminal investigation. And the Southern District called Ernst & Young a week after Arthur Anderson was convicted and essentially imploded because of these kinds of things. And so I think whether or not you think it's one investigation or it was interrupted the pressure existed in our view until 2013 I see my rebuttal time. Can I make one point on the sham partnership. Thank you. The key problem for the Commissioner, I think, is the record here at trial and the undisputed expert testimony about the diversification benefit. There's all sorts of things that taxpayers do with with an eye towards tax benefits. Think about purchasing municipal bonds and investment, you might not make but for the tax benefit, the court should hold the line on VOCA and ASA and And stick with the view that if you have a legitimate non tax business purpose that is enough to avoid this very harsh medicine of shaming the partnership. There are no further questions. Thank you, counsel. Thank you to all counsel will take this case under submission.
judges: Srinivasan, Henderson, Walker